GRIST v. THE UPJOHN COMPANY

1. WORDS AND PHRASES—DISCRETION—ABUSE.

The term "discretion" involves the idea of a choice being made between competing considerations; before an abuse of discretion will be found the result must be so palpably and grossly violative of fact and logic that an unprejudiced person can say that there was no justification for the ruling made.

2. WORDS AND PHRASES—ABUSE OF DISCRETION—NEW TRIAL.

The term "abuse of discretion" with respect to granting a motion for new trial connotes more than an error of law or judgment; it implies an unreasonable, arbitrary, or unconscionable attitude on the part of the trial court.

3. NEW TRIAL—DISCRETION.

A trial judge has a wide discretion in granting or refusing a new trial, either upon his own motion or that of one of the parties.

4. NEW TRIAL—TESTIMONY ON MOTION—TRIAL COURT—DISCRETION.

Decision by trial court to take testimony before ruling on defendant's motion for a new trial on ground of disqualification or prejudice of a juror in an action by plaintiff to recover damages from her former employer for slander and wrongful interference *held*, not an abuse of discretion where it was discovered by direct evidence after the verdict that one juror had been discharged from a job by his employer and the juror had not made this known on *voir dire* when questions concerning this were asked to the jury panel as a whole.

REFERENCES FOR POINTS IN HEADNOTES

[1-3] 39 Am Jur, New Trial §§ 201, 202.
[4] 39 Am Jur, New Trial § 198.
[5] 39 Am Jur, New Trial § 39 *et seq.*
[6-9] 39 Am Jur, New Trial § 45.
[10] 29 Am Jur 2d, Evidence § 493 *et seq.*
[11, 12] 33 Am Jur, Libel and Slander § 90 *et seq.*
[13] 33 Am Jur, Libel and Slander §§ 111–113.

5. NEW TRIAL—HEARING ON MOTION—BIASED JUROR—QUESTIONING
OF JUROR.

Refusal of trial court to allow counsel for either side to question a juror privately during the hearing of a motion for new trial on the ground of failure of the juror to disclose certain essential information and refusal to order the juror to read the transcript of the *voir dire* examination before testifying at the hearing on the motion *held*, not an abuse of discretion when the juror was advised of his right to consult with counsel before the hearing and declined such consulation, and where the juror did not request an opportunity to study the transcript.

6. NEW TRIAL—BIASED JUROR—VOIR DIRE EXAMINATION—DILIGENCE
OF COUNSEL.

Failure of counsel to ask each prospective juror individually if he had ever been discharged from a job for cause, when an affirmative reply may have been grounds for excusing the juror *held*, not a lack of diligence that would prevent counsel from succeeding in a motion for new trial when he asked the jury panel as a whole if they were ever discharged from a job for cause and later asked the juror in question if he had heard all the questions put to the jury panel and whether his answers would be the same, only to discover after the 10-2 verdict that the juror had in fact been discharged from a job for cause.

7. NEW TRIAL — BIASED JUROR — VOIR DIRE EXAMINATION — TRIAL
COURT — DISCRETION.

Decision of trial court that counsel's examination of the jury panel as a whole about previous discharges from employment for cause should put a reasonable man on notice that he should divulge such information if he had been so discharged *held*, not an abuse of discretion.

8. NEW TRIAL — VOIR DIRE EXAMINATION — CONCEALMENT OF IN-
FORMATION BY JUROR — PREJUDICE — TRIAL COURT — DISCRETION.

Findings by trial court that on the *voir dire* examination there was concealment by a juror by reason of the fact that he did not volunteer that at one time he had been discharged from employment for cause and that thereby defense counsel was misled to defendant's prejudice, and that the juror in question had made a false answer when he stated on *voir dire* that he had heard all the pertinent questions and answers and that his answers would be the same as the other jurors

and that this also misled defense counsel and prejudiced defendant *held*, decisions on fact questions and not an abuse of discretion.

9. NEW TRIAL—DISQUALIFIED JUROR—TRIAL COURT—DISCRETION.

The discretion given to trial courts is a broad discretion that permits the granting of a new trial on the ground that a juror was disqualified even though it cannot be shown by direct evidence that the juror in question was either disqualified or prejudiced.

10. EVIDENCE—ADMISSIBILITY—HEARSAY—CURATIVE ADMISSIBILITY—TRIAL COURT—DISCRETION.

Testimony offered by plaintiff but excluded from evidence as hearsay concerning statements by authorities at a place where plaintiff sought employment after her alleged wrongful discharge from defendant company *held*, within the discretion of the trial court to admit later under the doctrine of curative admissibility when testimony from defense witnesses concerning these statements was placed in evidence.

11. TORTS—SLANDER—PUBLICATION—DEFINITION.

"Publication" of defamatory matter is its communication intentionally or by negligent act to one other than the person defamed.

12. TORTS—SLANDER—PUBLICATION.

Publication of defamatory material may take place where conditions are such that the utterer of the defamatory matter intends or has reason to suppose that in the ordinary course of events the matter will come to the knowledge of some third person.

13. TORTS—SLANDER—PRIVILEGE—MALICE—INSTRUCTIONS TO JURY.

Trial court's instructions to jury that in order to recover for slander when occasions for publication are qualifiedly privileged plaintiff must prove that the statements were untrue and made in bad faith or in actual malice, or without a reasonable cause to believe them true *held*, erroneous because it states in effect that statements made without reasonable cause show actual malice, and because it fails to define actual malice as that which is actuated by ill-will with a design to causelessly and wantonly injure the person defamed.

Appeal from Kalamazoo, Raymond W. Fox, J. Submitted Division 3 November 13, 1968, at Grand Rapids. (Docket No. 4,380.) Decided March 25, 1969. Rehearing denied April 30, 1969. Leave to appeal denied July 9, 1969. See 382 Mich 768.

Declaration by Arletta T. Grist against The Upjohn Company, a Michigan corporation, for slander and wrongful interference with contractual relations. Verdict and judgment for plaintiff. Defendant's motion for new trial granted. Plaintiff appeals, and defendant cross-appeals as to errors asserted as grounds for a new trial. Affirmed.

*Hoffman, McDonald & Hoffman,* for plaintiff.

*Ford, Kriekard, Brown & Staton,* for defendant.

BEFORE: HOLBROOK, P. J., and T. G. KAVANAGH* and MCINTYRE,** JJ.

HOLBROOK, P. J. This is an action for slander and wrongful interference brought by plaintiff, Arletta T. Grist, against defendant, The Upjohn Company. A history of the progress of this action prior to actual trial is set forth in *Grist v. The Upjohn Company* (1965), 1 Mich App 72.

A jury trial was held in the circuit court for Kalamazoo county with the Honorable Raymond W. Fox presiding. On March 10, 1967, the jury returned a verdict in favor of the plaintiff for $47,000

---

* Thomas Giles Kavanagh, Justice of the Supreme Court, assigned to sit on the Court of Appeals from February 27, 1969, "until the work assigned has been completed" pursuant to Const 1963, art 6, § 4, and CLS 1961, § 600.225, as amended.

** Circuit Judge, sitting on the Court of Appeals by assignment.

damages against defendant. This verdict was a 10-member verdict,[1] 2 members not agreeing.

Defendant made a timely motion for a new trial listing 9 grounds for the granting of the motion. The ninth ground was considered first. It asserted misconduct on the part of one[2] of the jurors in falsely or erroneously concealing and failing to disclose material facts concerning his employment having been terminated for cause. After the taking of testimony of the juror in question and 3 other witnesses, hearing extended arguments by counsel and considering exhaustive briefs of both parties, the trial judge granted the motion for new trial based upon the ninth ground.

The plaintiff has appealed claiming the trial court erred and abused its discretion in granting a new trial. Defendant has cross-appealed raising 4 issues originally stated in its motion for new trial.

### Plaintiff's Appeal

We will first consider the appeal of plaintiff which poses 7 questions pertaining to the claimed abuse of discretion by the trial court. We restate these questions in our own words as follows:

(1) Did the trial court abuse its discretion in ruling that the affidavits filed in support of defendant's motion for new trial and the *voir dire* examination were sufficient to justify a fact-finding inquiry into the alleged misconduct of the juror?

(2) Did the trial court err in the manner in which it handled the fact-finding hearing including the question of permitting plaintiff's and defendant's counsel to question the juror privately prior to his

---

[1] PA 1963 (2nd Ex Sess), No 17, effective March 24, 1964, MCLA § 600.1238 (Stat Ann 1968 Cum Supp § 27A.1238).

[2] This juror was one of the 10 who rendered the verdict for plaintiff.

testifying and making available to the juror the transcript of the *voir dire* and affidavits in support of the motion for new trial?

(3) Did the trial court err in ruling that the requirement of diligence on the part of defendant's counsel was satisfied by the *voir dire* examination in this case?

(4) Did the trial court abuse its discretion in ruling that the *voir dire* of all the jurors in this case would indicate to the mind of a fair and reasonable man that defendant's counsel was seeking to ascertain whether or not the employment of the jurors had ever been terminated which would require the disclosure by the juror in question of the fact that his had been terminated for cause?

(5) Did the trial court abuse its discretion in holding that on the *voir dire* there was concealment by reason of the fact that the juror did not volunteer in answer to the *voir dire* questions that at one time he had been discharged from employment for cause and that defendant's counsel was thereby misled to defendant's prejudice?

(6) Did the trial court abuse its discretion in holding that the juror made a false answer when he stated on the *voir dire* that he had heard all the questions put to prospective jurors and answers made in response to such questions by all the other prospective jurors and that his answers would be as theirs, and that defendant's counsel was thereby misled to defendant's prejudice?

(7) Did the trial court abuse its discretion in granting a new trial even though it was not shown that the juror was a disqualified juror nor was it directly shown that he was a prejudiced juror?

The facts necessary to a proper determination of the issues raised, appear to be as follows: Plaintiff bases her action upon slander and unlawful inter-

ference arising out of her dismissal by defendant. It is her position that the reasons given for the discharge for cause were unfounded, that these reasons for discharge were necessarily repeated by her to prospective employers upon their questioning her concerning past employment, and also that they were repeated by the authorized employees of defendant to the prospective employers of plaintiff upon inquiry. Plaintiff claims these slanderous statements were made with malice and prevented her from gaining or keeping employment, to her damage. The defendant claims that the reasons given for plaintiff's dismissal were well-founded and true and denies any malice in making any statement pertaining to her dismissal.

The one juror's misconduct found to be adequate by the trial court for the granting of a new trial consisted of the juror's failure to disclose the fact that he had been discharged for cause from his employment in 1962. No one connected with the case was aware of this fact until sometime after the verdict, when it came to the attention of counsel for defendant.

On the *voir dire* questioning by defense counsel there appears a general statement as follows:

"Now, with that preliminary comment, I would like to just say a word about my order. I do not, like Mr. Hoffman, I do not want to have to repeat all of these questions with each one of you, and so I have a question as to whether to interrogate you individually or just interrogate or talk to you as a group. Now, what I would like to do is take the end juror, and, sir, I believe that is Mr. Fred Smith at the end there. I would like to ask you some questions, Mr. Smith, and I chose you because you are far away. I think when I get through with you, the other jurors can listen to what I have asked you,

and after I have talked to you I think maybe that we can save some time that way.

"Now, the court and Mr. Hoffman have told you that this case is going to involve an employer, The Upjohn Company, and it is going to involve an employee, a Mrs. Grist. We know further that it is going to involve a question of termination and discharge, and it is going to involve questions as to what was said by The Upjohn Company when Mrs. Grist tried to get employment. Now, that raises a series of questions that I would like to ask you, sir, that might affect your fairness and ability to be fair to both of the parties in this case. I would ask you first, sir, if you were—I suppose these questions will go to your occupational past so to speak—I would like to ask you, sir, if you were and have been an employer through most of your life. Do you understand the question? Have you been an employer or an employee?

"*Mr. Smith:* Employee.

"*Mr. Staton:* Now, have you ever been terminated, sir, or discharged from a job? And is there anything in your employment—well, let's say it this way: have you had occasion to apply for jobs and had to ask for reference checks and things of that kind?

"*Mr. Smith:* No, sir.

"*Mr. Staton:* Well, now, just take a look at your whole employment past, Mr. Smith, and let me ask you this: is there anything about it that would affect your ability to be fair in this case, a case that involves an employer and an employee, and a case that involves termination, or anything about it at all that would affect you in being fair about deciding this case between the parties?

"*Mr. Smith:* I don't think so."

Similar references to termination or discharge from employment are contained in the *voir dire* as conducted by defendant's counsel. Among these are the following:

"*Mr. Staton:* Well, Mr. Muryne, let's start off this way, since we can sort of see a pattern revolving [*sic*]. Were you an employer during your occupational past?

"*Mr. Muryne:* Employee.

"*Mr. Staton:* Were you a long time employee?

"*Mr. Muryne:* Thirty years at one concern.

"*Mr. Staton:* With whom did you work that thirty years?

"*Mr. Muryne:* Galloup Pipe and Supply Company.

"*Mr. Staton:* All right. Now, of course, during that time you had no occasion, I suppose, to make applications.

"*Mr. Muryne:* Right.

"*Mr. Staton:* And did you retire from that?

"*Mr. Muryne:* No, I was let go, when I got older.

"*Mr. Staton:* You were discharged as [*sic*] you got older, is that right? Let me ask you a couple of questions here. Would the fact that you were terminated, and terminated after having worked there for some period of time, would those facts affect you in any way in trying this case if the facts in this case should show that there was a termination?

"*Mr. Muryne:* None.

"*Mr. Staton:* And that there was a termination after a considerable period of time of employment?

"*Mr. Muryne:* No.

"*Mr. Staton:* You think you can be fair in spite of your experiences?

"*Mr. Muryne:* Yes.

"*Mr. Staton:* All right. Now, except for that, have you heard the questions that I asked all the other witnesses and particularly Mr. Smith on the end down there?

"*Mr. Muryne:* Yes, sir.

"*Mr. Staton:* And may I assume that your answers would be the same?

"*Mr. Muryne:* Right."[3]

(Mr. Sandlin.)

"*Mr. Staton:* Now, this is Mr. Sandlin, I believe, sir?

"*Mr. Sandlin:* Right.

"*Mr. Staton:* And I will ask you now that same question about your occupational past, an employer or employee?

"*Mr. Sandlin:* Employee.

"*Mr. Staton:* And a long-time employee? And I suppose when I say a long time I mean at one place. (*Answer inaudible to the reporter.*) Had you occasion in the past to apply for jobs from time to time? (*Answer inaudible to the reporter.*) Had you ever had occasion to ask for reference checks from other employers that you had? (*Answer inaudible to the reporter.*) In the past when you changed jobs, were they just voluntary quits on your part or were they terminations?

"*Mr. Sandlin:* Well, mostly I was truck driver and I had to quit that on account of my back.

"*Mr. Staton:* I see. And are you employed now, sir?

"*Mr. Sandlin:* Yes, sir.

"*Mr. Staton:* But not as a truck driver?

"*Mr. Sandlin:* No.

"*Mr. Staton:* Is there anything about your background as an employee and working as a truck driver, reasons for terminating, anything about that at all that would affect you in your ability to be fair between the parties in this case? You understand it involves an employee and termination of an employee, matters of this kind? Do you think you could be perfectly fair in deciding this case even though those issues are involved?

"*Mr. Sandlin:* Yes."

---

[3] This prospective juror was excused by defendant's first peremptory challenge.

(Mrs. Mrozek.)

"*Mr. Staton:* Now I think, Mrs. Mrozek have you been employed as an employee?

"*Mrs. Mrozek:* Yes.

"*Mr. Staton:* And never as an employer?

"*Mrs. Mrozek:* No.

"*Mr. Staton:* Without getting too far into it, Mrs. Mrozek, was there anything about your employment, were there any terminations or hard feelings between you and your employer or efforts to get employment? Nothing of that in your background?

"*Mrs. Mrozek:* No.

"*Mr. Staton:* If this case involves it, as we know it does, there is just nothing in your background that would keep you from being as fair to one side as you are to the other? And have you heard all the questions I asked Mr. Smith now?

"*Mrs. Mrozek:* I have.

"*Mr. Staton:* And those touching Mr. Stearns? Those touching the objections to evidence if made? And those touching the importance of treating parties before the court equally? Do you agree with that principle?

"*Mrs. Mrozek:* Yes."

(Mrs. Johnson.)

"*Mr. Staton:* Now, Mrs. Johnson, have you been an employee?

"*Mrs. Johnson:* I was employed at Checker Cab from '43 to '61 excepting two years that I had left and left the city and then returned in '50 and they took me back on my job.

"*Mr. Staton:* All right. May I assume now that there is nothing in your experiences as an employee, nothing in the way of terminations, discharges, or things of that kind that would affect your being fair to both the parties in this case?

"*Mrs. Johnson:* There were three of us who were terminated about three days on account of a job

they put us on that wasn't for a woman to do. It was on account of heavy lifting.

"*Mr. Staton:* I see.

"*Mrs. Johnson:* And we were replaced back again.

"*Mr. Staton:* Thank you for that information. Now let's ask ourselves the important question. Is there anything in that experience, in the fact that it happened, anything about it at all, that would affect you in being fair to Mrs. Grist —

"*Mrs. Johnson:* No.

"*Mr. Staton:* — and The Upjohn Company in this case?

"*Mrs. Johnson:* No.

"*Mr. Staton:* You really feel that you could be just as fair as if it hadn't happened, I suppose?

"*Mrs. Johnson:* Yes, sir."

Shortly thereafter the juror in question who was the last juror seated and accepted was called to the jury box and the following transpired:

(Mr. Stonkus.)

"*The Court:* Mr. Stonkus, have you been able to hear all that has been said?

"*Mr. Stonkus:* Very good.

"*The Court:* Good. Do you know anything about this case?

"*Mr. Stonkus:* I do not.

"*The Court:* Do you know Mrs. Grist or her husband, Mr. Morris Grist?

"*Mr. Stonkus:* I do not.

"*The Court:* Are you employed by or have you ever been employed by The Upjohn Company?

"*Mr. Stonkus:* Indirectly.

"*The Court:* Indirectly. Well, tell me how that is indirectly.

"*Mr. Stonkus:* Well, I work for a contractor who had some work out there.

*"The Court:* I see. But you were an employee of a contractor?

*"Mr. Stonkus:* Yes, sir.

*"The Court:* Who did some work at Upjohn?

*"Mr. Stonkus:* Yes.

*"The Court:* Are they doing any work now for Upjohn?

*"Mr. Stonkus:* Well, they are, yes.

*"The Court:* Are you, you yourself?

*"Mr. Stonkus:* No. No.

*"The Court:* You are answering me right, I asked if they were, and now I am asking if you are.

*"Mr. Stonkus:* Yes.

*"The Court:* Now, because of your employment with a contractor who does work and is working for The Upjohn Company and because you have worked out there, would you be embarrassed sitting upon this trial in any way?

*"Mr. Stonkus:* No. No.

*"The Court:* Any of your family or relatives work at The Upjohn Company?

*"Mr. Stonkus:* No.

*"The Court:* Or have they in the past?

*"Mr. Stonkus:* No.

*"The Court:* Do you know any of these attorneys?

*"Mr. Stonkus:* No, I do not.

*"The Court:* The four attorneys? Do you know any of these names I have mentioned?

*"Mr. Stonkus:* No.

*"The Court:* Do they ring a bell with you or do you recognize any of the people?

*"Mr. Stonkus:* No.

*"The Court:* All right, Mr. Hoffman, you may inquire.

*"Mr. Hoffman:* I don't know whether I wasn't listening or else I couldn't hear the Court, but do you have any friends that are employed at Upjohn?

*"The Court:* I didn't ask him that.

"*Mr. Stonkus:* No, I haven't any friends. When we worked in the building and were up and down in—you made friends, I suppose, yes.

"*Mr. Hoffman:* Yeah.

"*Mr. Stonkus:* But I mean by the way we delivered the goods there and we worked in this whole building and remodelling, and you get acquainted with the elevator operator or something like that.

"*Mr. Hoffman:* Did you work for a contractor who worked on their new business office?

"*Mr. Stonkus:* When they first started I did. When they laid the ground work, I worked there about a week. Then I got called back to my other old job and I left and went back.

"*The Court:* All right, Mr. Staton.

"*Mr. Staton:* Mr. Stonkus, I notice that you were sitting fairly close back there. May I assume, and I hope I may, that you heard all the questions that I asked the jurors, the rest of the jurors here?

"*Mr. Stonkus:* Yes, I did.

"*Mr. Staton:* Could you hear them?

"*Mr. Stonkus:* Yes, I could.

"*Mr. Staton:* And could you hear their answers to my questions?

"*Mr. Stonkus:* Yes, I did.

"*Mr. Staton:* And would your answers have been as theirs were and as they answered me?

"*Mr. Stonkus:* Yes.

"*Mr. Staton:* All right. Now, by trade, Mr. Stonkus, I believe you are a carpenter, aren't you?

"*Mr. Stonkus:* Yeah. Well, I retired. I am in maintenance now.

"*Mr. Staton:* I see. During your occupational career, have you been an employer at any time, Mr. Stonkus?

"*Mr. Stonkus:* No. No.

"*Mr. Staton:* And you have been an employee, though, apparently.

"*Mr. Stonkus:* Yes, all my life.

"*Mr. Staton:* Now, have you had anything in your experiences as an employee that would affect

you in any way in deciding this case between Mrs. Grist and The Upjohn Company?

"*Mr. Stonkus:* No, it wouldn't.

"*Mr. Staton:* I think the court did ask this question, but do you know of any reason why you couldn't be a fair juror in this case to both of the parties?

"*Mr. Stonkus:* No, I don't.

"*Mr. Staton:* I think that's all, your Honor."

The affidavits of counsel filed in support of defendant's motion for new trial sets forth pertinent information to the effect that no juror who had a discharge for cause as a part of his employment background or history would have been accepted by defendant and in their opinion such a juror could not fairly and impartially decide the issues involved; that the jurors were collectively and individually interrogated concerning such facts; that the failure of the juror in question to disclose the fact that he was discharged for cause deceived and misled counsel and that said juror would not have been accepted had such information been disclosed in response to the *voir dire* interrogation; that counsel had no knowledge that the juror had been discharged from employment for cause but discovered it on April 7, 1967; and that an attached affidavit of William F. Daily was also filed which reads as follows:

"That he was at the time of the discharge of Sandy A. Stonkus and now is employed by Precast-Schokbeton, Inc.; that of his own knowledge Sandy A. Stonkus was employed with said firm and was discharged for cause; that your affiant has knowledge concerning the facts of said discharge; that your affiant will not disclose voluntarily and without court order further information regarding the discharge of said employee."

From the record it appears that the juror in question was present at the first hearing held on the motion for new trial and that the questions put to him and his answers on *voir dire* were read in open court. The questions put to several other jurors and their answers were likewise read. The juror was also informed that he could have access to the transcript of the entire *voir dire* examination to read and that he could have counsel if he desired. The juror did not afford himself of the privilege of reading the transcript nor did he make a request to do so. Neither side's counsel were allowed to question the juror privately. Counsel for plaintiff requested the court to have the juror read the transcript of the *voir dire* on the day and just before the juror testified, which the court refused because the juror had never requested or afforded himself the privilege of reading it.

The juror was first questioned by the court and the record shows in part as follows:

"*Q.* All right. Now, what happened to your job at Precast? Did you—what happened at your termination?

"*A.* Oh. Well, like the night before we was over at the tavern playing pool, and this one fellow I— we had a bet. I bet that this one fellow would beat him and I won a little money off of him. And the next morning I came to work and this was around 10 o'clock I mean when this happened, and we was pulling this stuff out of the forms and this fellow said—called me an s.o.b. And I says, 'Well, you —'.

"*Q.* You mean the fellow that lost the bet?

"*A.* Yes, the one I won money off of, see. And I said, 'You better be kidding when you say that.' And he says, 'I'm not.' So I just jumped off the mule and I hit him. And so I thought, you know, that that would be the end of it, but then somebody had told him that if he went in and reported it to

the boss that I would be fired, which is a company rule and I knew that. So, he went in and so then finally the personnel man came out and he says, 'well, why don't you go and punch out?' he says, 'you know what the thing is.' So, I went up and— well, I didn't punch out; I said, 'I am going to eat dinner first and I will be back.' I was going to call our union, you know, about it, but I knew it was a company rule, that I was in the wrong, and so that was it. So, I went ahead and eat dinner and when I came back this personnel fellow had punched me out.' "

In the examination of the juror by Mr. Staton for defendant, more detailed testimony was given with the record disclosing in part the following:

"*Q.* Now let me ask you this, Mr. Stonkus, on page 25 to Mr. Smith my statement or question: 'Mr. Staton: Now, have you ever been terminated, sir, or discharged from a job? And is there anything in your employment—well, let's say it this way: Have you had occasion to apply for jobs and had to ask for reference checks and things of that kind? Mr. Smith: no, sir.'

"Now Mr. Stonkus, can you tell us now whether you heard me ask that question of Mr. Smith on the day in question?

"*A.* Well, I must have heard it because I never had an occasion—my answer would have been like his. No, I never had to have no reference for another job on account of anytime I wanted a job I just went up to the union and got a job.

"*Q.* Did you understand this question to ask whether he had been terminated or not?

"*A.* No, I don't remember that, no.

"*Q.* Let's see if I understand you now. The question, 'Now, have you ever been terminated, sir, or discharged from a job?'—you didn't recall that being asked?

"*Mr. Hoffman:* Well, just a moment, I am going to object. I am going to object because it calls for his interpretation on that question of wheher you asked it or not. I construe the question that you withdrew it and you changed it.

"*The Court:* I think the question is, first, if Mr. Stonkus recalls the question, and, secondly, how did he understand it. It doesn't make any difference how we understand it, it is how he understood it.

"*Mr. Hoffman:* He has already given his answer as to how he understood it.

"*Mr. Staton:* I don't think he has answered completely and clearly.

"*The Court:* He may have and he may not have.

"*Q. (By Mr. Staton).* Did you understand from this question that I asked Mr. Smith whether or not he had been terminated or discharged from a job or—

"*A.* I don't remember you asking him that question.

"*Q.* But you do remember me asking Mr. Smith whether or not he had occasion to apply for jobs and whether or not he had asked for reference. checks and things of that kind?

"*A.* Well, maybe not him. I heard you ask somebody on the jury at sometime when I was sitting back there, because I didn't think it was so important that I should listen to everything here until I was called, and what was asked of me then I would answer.

"*Q.* Now, Mr. Stonkus, let me ask you this. Page 38, talking to Mrs. Mrozek. Mrs. Mrozek sat right over here, the nearest juror right over there in the back seat. This is on page 57. 'Mr. Staton: Without getting too far into it, Mrs. Mrozek, was there anything about your employment, were there any terminations or hard feelings between you and your employer or efforts to get employment? Nothing of that in your background? Mrs. Mrozek: No.'

"Did you hear that question?

"*A.* I can't recall of your asking her that, no.

"*Q.* Let me ask you this, Mr. Stonkus: Do you know now whether you heard it then?

"*A.* Do I know now whether I heard it? Well, if I had heard you ask that I could tell you but I don't.

"*Q.* You don't know whether you heard me say that or not?

"*A.* No, I know I didn't hear you say it."

In each of the 7 questions posed by plaintiff on appeal, she asserts that the trial court abused its discretion in a particular manner therein set forth. We deem it necessary to consider the meaning of the terms "discretion" and "abuse of discretion."

In *Spalding* v. *Spalding* (1959), 355 Mich 382, 384, where the exercise of discretion turned upon a factual determination made by the trier of the facts, it was defined as:

"The term discretion itself involves the idea of choice, of an exercise of the will, of a determination made between competing considerations. In order to have an 'abuse' in reaching such determination, the result must be so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias."

In the case of *Detroit Tug & Wrecking Company* v. *Wayne Circuit Judge* (1889), 75 Mich 360, 361, it was ruled that:

"The granting or refusing of a motion for a new trial is a matter which rests in the discretion of the trial court. * * *

"To warrant this court in interfering in matters so entirely in the sound discretion of the circuit court as the granting or refusing of a new trial, the abuse of discretion ought to be so plain that, upon consideration of the facts upon which the court acted, an unprejudiced person can say that there was no

justification or excuse for the ruling made. It is therefore of the first importance that the *facts* upon which the circuit court acted in refusing a new trial in this case should be fully stated and considered."

In *People* v. *Poole* (1967), 7 Mich App 237, 242, this Court stated:

"The granting of a motion for new trial lies within the sound discretion of the trial court, and to establish error, a clear abuse of this discretion must be shown. *People* v. *Dailey* (1967), 6 Mich App 99. 66 CJS, New Trial, § 201, p 490 states that this discretion vested in a trial court is 'a legal, judicial discretion, to be exercised according to, and within the bounds of, law and reason.' 'Abuse of discretion' with respect to granting a motion for new trial connotes more than an error of law or of judgment; it implies an unreasonable, arbitrary, or unconscionable attitude on the part of the trial court. *Steiner* v. *Custer* (1940), 137 Ohio St 448 (31 NE2d 855)."

The application by the courts of the rules hereinabove set forth are clarified in the case of *Hoskin-Morainville Paper Co.* v. *Bates Valve Bag Corp.* (1934), 268 Mich 443, 449, 450:

"The question of reviewing the discretion of trial courts in granting or refusing new trials is a most delicate one. The rule in this State is that the judge has a wide discretion in either granting or refusing a new trial, either upon his own motion or that of the parties. *J. L. Hudson Co.* v. *Barnett* (1931), 255 Mich 465.

" 'Even greater latitude is allowed the trial court in granting than in refusing new trials, and the appellate court will interfere more reluctantly where the new trial is granted than where it is denied, since in such cases the rights of the parties are not finally settled as they are where the new trial is refused.' 4 CJ 831, 832, § 2813.

" 'It is true that the Constitution has given this Court a general superintending control over all inferior courts, but in the exercise of this jurisdiction it has never been claimed that this Court can substitute its discretion for that of the inferior tribunal, and compel it to exercise and enforce our discretion, and not theirs.' *Detroit Tug & Wrecking Co.* v. *Wayne Circuit Judge* (1889), 75 Mich 360."

Plaintiff's first question asserts that the affidavits filed with the motion for new trial together with the *voir dire* examination were insufficient to warrant the order of the court permitting the taking of testimony to determine whether or not the defendant had been denied a fair trial.

The procedure followed in this case is provided for in GCR 1963, 527, and specifically 527.3 which provides:

"Affidavits. If the facts stated in the motion for a new trial or to amend the judgment do not appear from the record of the case, the motion shall be supported by affidavits of the party or some other person. When a motion is supported by affidavits they shall be served with the motion. The opposing party has 20 days after such service within which to serve opposing affidavits, which period may be extended by the parties by written stipulation for 20 additional days, or may be extended or shortened by the court for good cause shown. The court may permit reply affidavits. *The court may call and examine witnesses.*" (Emphasis supplied.)

The plaintiff claims that the affidavits contained only hearsay and defendant's counsel failed to question the juror with particularity and therefore it was error for the trial court to permit the calling of witnesses and the taking of testimony. The affidavit of Mr. Daily directly indicated that the juror had been discharged for cause from his employment. This was not hearsay as to the issue raised. Wheth-

er defendant's counsel properly questioned the juror with sufficient particularity was a question of fact and therefore in determining if the trial court abused its discretion in this regard the rule in *Spalding* v. *Spalding, supra,* must be followed. Applying this rule, we conclude that the trial court did not abuse its discretion. The affidavits of counsel for defendant asserts *inter alia* that the non-disclosure by the juror as to his having been discharged for cause was misconduct that prevented defendant from receiving a fair trial. This is not a case where affidavits of jurors are proffered to show misconduct of a juror or jury for the purpose of impeaching their verdict. *Mandjiak* v. *Meijer's Super Markets, Inc.* (1961), 364 Mich 456; *Ballance* v. *Dunnington* (1929), 246 Mich 36; *Trudell* v. *Pearll* (1922), 219 Mich 514; *In re Merriman's Appeal* (1896), 108 Mich 454.

Plaintiff's second issue questions the manner in which the trial court handled the fact-finding hearing. Neither side's counsel were permitted to talk to the juror in question privately. Plaintiff's counsel complains—defendant's counsel does not. The juror was properly advised of his right to consult with and have counsel some days prior to the hearing. Plaintiff's counsel did not represent the juror and it is difficult to understand how plaintiff was prejudiced under the circumstances. There was no necessity for an attorney absent a request from the juror himself. The refusal of the court to order the juror, upon request of plaintiff's counsel, to read the transcript and affidavits before testifying is claimed to be error. At no time did the juror request further time to study, read, or have explained the *voir dire* or the affidavits. He had heard the reading of his questions and answers and those of several other jurors pertinent to the issue. Plain-

tiff's counsel cites no authority in support of his claim of error nor have we found any. We find no abuse of discretion by the trial court as to the second issue raised by plaintiff.

Plaintiff's third question places in issue the matter of whether defendant's counsel was diligent in his questioning of the juror on *voir dire.* In considering this issue, it is well to review the record. Defendant's counsel made a general statement to the court and jury at the beginning of the *voir dire* and he said in part:

"We know further that it is going to involve a question of termination and discharge, and it is going to involve questions as to what was said by The Upjohn Company when Mrs. Grist tried to get employment. Now, that raises a series of questions that I would like to ask you, sir, that might affect your fairness and ability to be fair to both of the parties in this case. I would ask you first, sir, if you were—I suppose these questions will go to your occupational past so to speak—I would like to ask you, sir, if you were and have been an employer through most of your life. Do you understand the question? Have you been an employer or an employee?

"*Mr. Smith:* Employee.

"*Mr. Staton:* Now, have you ever been terminated, sir, or discharged from a job? And is there anything in your employment—well, let's say it this way: have you had occasion to apply for jobs and had to ask for reference checks and things of that kind?

"*Mr. Smith:* No, sir."

Other jurors were questioned about terminations for cause. One juror who had been discharged because of his age was peremptorily excused by defendant. At the hearing on the motion for new trial, Mr. Stonkus remembered that he had said at the begin-

ning of his *voir dire* examination that he had been able to hear all that had been said. He told counsel for defendant that he had heard all the questions that counsel had asked the other jurors as well as their answers. However, upon closer examination he testified in response to defense counsel's questions in the manner following:

"*Q.* Did you understand from this question that I asked Mr. Smith whether or not he had been terminated or discharged from a job or—

"*A.* I don't remember you asking him that question."

And Mr. Staton questioning Mr. Stonkus about Mrs. Mrozek's *voir dire*:

" 'Without getting too far into it, Mrs. Mrozek, was there anything about your employment, were there any terminations or hard feelings between you and your employer or efforts to get employment? Nothing of that in your background? Mrs. Mrozek: No.' Did you hear that question?

"*A.* I can't recall of your asking her that, no.

"*Q.* Let me ask you this, Mr. Stonkus: Do you know now whether you heard it then?

"*A.* Do I know now whether I heard it? Well, if I had heard you ask that I could tell you but I don't.

"*Q.* You don't know whether you heard me say that or not?

"*A.* No, I know I didn't hear you say it.

\*    \*    \*

"*Q.* (*By Mr. Staton*). Let me ask you this question: did you understand me to have asked any juror before you took the stand, or before you took the box, did you understand me to ask any juror about whether or not they were discharged?

"*A.* Yes. Yes. I think I remember you asking that, yes.

\*    \*    \*

"*Q.* And then it would not be always necessary, by doing it that way, to ask each other juror the same questions. That is what you understood, wasn't it?

"*A.* Well, yes. Yes.

"*Q.* All right. Now, as—did you hear, then, the questions which I put to Mr. Smith?

"*A.* No. No, because I was sitting back there and I wasn't paying too much attention. I didn't think it was any—you know—that I should listen to you, you know, question every juror that was there. So, unless I was—"

From the stated record it appears that on the *voir dire* examination of the juror, counsel for defendant should have been able to rely on the statement of the juror that he had heard all that had taken place prior thereto, and therefore understood that the fact of a juror-employee having been terminated from employment for cause was important and to be divulged if such was the case. After trial when it was learned that he had been terminated for cause, it came to light at the hearing on the motion for new trial that he had not heard pertinent parts of the *voir dire* pertaining to terminations and discharges and that he had not been paying too much attention to what was being said, in spite of his previous *voir dire* statement that he had heard everything said.

Had defendant's counsel asked each prospective juror the direct question, "Have you ever been terminated for cause," the question of diligence would not be before us. The asking by counsel of the direct question is not imperative, if from a fair evaluation of the entire *voir dire* one can say that disclosure of the fact was called for and that by the testimony of the juror on *voir dire,* counsel was honestly placed in a position where the question was not asked.

The learned trial judge cited the following 3 authorities in support of his ruling that defendant's counsel had used proper diligence on the *voir dire* examination: 39 Am Jur, New Trial, § 44, pp 64, 65, where the writer said:

"It is well settled that a party who is aware of any circumstance affecting the qualifications or the competency of a juror is bound to make his objection by way of challenge before that juror is sworn, and if he fails to do so, he is deemed to have waived the objection and cannot, after an adverse verdict, assert it as ground for a new trial; he may not speculate upon a favorable result by withholding his objection until after the verdict is returned, and then when the verdict is unfavorable, move for a new trial. Similarly, if knowledge of the disqualification of a juror is acquired after the jury is sworn, but before verdict, a failure to make objection at the time will amount to a waiver of the right to a new trial on that ground. It is equally well settled that at the instance of a party, a verdict will not be set aside and a new trial granted because a juror was disqualified, when failure to discover the incompetency of the juror or the lack of his qualification is due to the failure of the complaining party to exercise reasonable diligence. Thus, it has been ruled that a failure to make inquiries or to make thorough examination to determine the competency of the juror will amount to a waiver of objection on that ground, except, according to some decisions, where the objection relates to a matter which was not reasonably to have been anticipated. *On the other hand, it seems that it is not incumbent upon the parties to cover minutely all phases of the particular subject by a long series of specific questions, but is sufficient to ask such questions as indicate to the mind of a fair and reasonable man what information the examining counsel seeks to elicit. The matter must be left largely to the discretion of the trial judge.*" (Emphasis supplied.)

The case of *O'Brien* v. *Judge of Recorder's Court of Detroit* (1926), 234 Mich 554, was a condemnation matter brought by the city of Detroit wherein the jury had made an award to 2 property owners, one Trossel and another O'Brien.   The city filed a motion for new trial and the trial court ordered a new trial as to both property owners.   Mr. Justice Sharpe stated, pp 556, 557:

"It appeared that one of the jurors was a half-brother of the wife of Trossel's brother.   On his *voir dire* examination he stated that he was not a relative of Trossel.   While this answer was strictly true, the defendant felt that the juror, in fairness to the parties, should have disclosed the facts.

"The motion was supported by an affidavit, in which the witness deposed that the verdict was excessive.   It is true that the affiant was a witness for the city on the trial and testified as to the value of the property to be taken.   We are impressed that the facts presented to the defendant necessitated the exercise of a judicial discretion on his part in granting or denying the motion.   His determination, based thereon, that a new trial should be granted, will not be interfered with by us on mandamus.   *People* v. *Branch Circuit Judge* (1868), 17 Mich 67; *Detroit Tug & Wrecking Co.* v. *Wayne Circuit Judge* (1889), 75 Mich 360; *Reynolds* v. *Newaygo Circuit Judge* (1896), 109 Mich 403; *Fort Wayne & B. I. R. Co.* v. *Wayne Circuit Judge* (1896), 110 Mich 173; *Hayes* v. *Ionia Circuit Judge* (1900), 125 Mich 277; *General Necessities Corp.* v. *Wayne Circuit Judge* (1921), 214 Mich 138; *Breisacher* v. *Judge of Recorder's Court* (1923), 223 Mich 254."

Also, see *Pearcy* v. *Michigan Mutual Life Insurance Co.* (1887), 111 Ind 59 (12 NE 98).

We find additional light in 66 CJS, New Trial, § 22, pp 115, 116, wherein the writer states:

"The fact that a juror on the *voir dire* examination falsely denied or concealed matters which would establish his disqualification or incompetency *or would lead the parties to challenge him is ground for a new trial,*[4] and this rule has been applied where a juror had personal knowledge of material facts in the case, had formed and expressed an opinion on the case, had served as a juror on a former trial of the same case, had been convicted of a felony, was an alien, was prejudiced against the unsuccessful party or was partial to the successful party, was interested in the action, was related to a party, counsel, or person interested, or had a business connection or relationship with a party, counsel, or interested person." (Emphasis supplied.)

After a careful review of all the facts present in this cause, and applying the law as set forth above, we cannot say that the trial court's ruling was clearly erroneous or that the trial court abused its discretion.

In the fourth issue raised by plaintiff, it is claimed that the trial court abused its discretion in determining that the *voir dire* of all the jurors would indicate to the mind of a fair and reasonable man that defendant's counsel was seeking to ascertain whether or not the jurors had ever been terminated from employment which would require a disclosure by the juror in question of the fact that he had been terminated for cause.

We have previously carefully reviewed the record. This issue presented a question of fact which was resolved by the trial court in its determination. The previous reasoning and cited law applies likewise to this issue and we cannot say that the trial court abused its discretion.

---

[4] Falsity of information held not established. *Rhoades* v. *Finn* (1939), 288 Mich 262.

In the next 2 issues raised, plaintiff asserts abuse of discretion in the trial court's (5) holding that under the *voir dire* there was concealment by reason of the fact that the juror did not volunteer that at one time he had been discharged from employment for cause and that defendant's counsel was thereby misled to defendant's prejudice, and (6) holding that the juror made a false answer when he stated on the *voir dire* that he had heard all the questions to prospective jurors and answers made to such questions by all the other prospective jurors and that his answers would be as theirs, and that defendant's counsel was thereby misled to defendant's prejudice.

These determinations by the trial court were likewise resolved considering the facts present and were questions of fact. The same law previously applied in this opinion is controlling. We cannot say that the trial court in determining the facts to be as stated in issues 5 and 6 abused its discretion.

The seventh issue raised by plaintiff claims abuse of discretion in granting a new trial even though it was not shown that the juror was a disqualified juror nor was it directly shown that he was a prejudiced juror. In considering this claimed error, it is well to review the law applicable to the granting of new trials which has been referred to in this opinion, *viz.: Detroit Tug & Wrecking Co.* v. *Wayne Circuit Judge, supra; People* v. *Poole, supra; People* v. *Dailey, supra;* 66 CJS, New Trial, § 201, p 490; *Steiner* v. *Custer, supra; Hoskin-Morainville Paper Co.* v. *Bates Valve Bag Corp., supra; J. L. Hudson Co.* v. *Barnett, supra;* 39 Am Jur, New Trial, § 44, pp 64, 65; *O'Brien* v. *Judge of Recorder's Court of Detroit, supra; Pearcy* v. *Michigan Mutual Life Insurance Co., supra;* 66 CJS, New Trial, § 22, pp 115, 116; and *Rhoades* v. *Finn, supra.*

We interpret the applicable law in this State to be that the discretion given to trial courts is a broad discretion that permits the granting of a new trial under the circumstances present in this case even though it cannot be shown by direct evidence that the prospective juror was a disqualified juror or that he was a prejudiced juror.

## *Defendant's Cross-Appeal*

The defendant's cross-appeal reasserts four of its grounds of error stated in its motion for new trial as additional reason for sustaining the trial court's order granting new trial.

The questions raised therein are stated and dealt with in order.

(1) Did the trial court err in admitting the hearsay testimony of Arletta Grist, Thomas Stearns, and Mary Clare Golla, under the doctrine of curative admissibility?

This testimony pertains to what was said by Mr. Golla and Mr. Madgwick, officers of Borgess Hospital, from whom plaintiff sought employment after her discharge by defendant. This testimony was first refused admission because it was hearsay. However, one of the officers of defendant testified that he and another had talked to Mr. Golla and Mr. Madgwick, that he didn't recall exactly what they had said, but it was his impression that they confirmed what the people of Upjohn had said, *i. e.,* the reason given for discharge of Mrs. Grist was unsatisfactory attendance. Thereafter the trial court made this statement to the jury:

"*The Court:* Members of the jury: The attorneys asked to speak to me, and I think used very good judgment in their suggestion in which they all join, and that is that I make a brief explanation so that

you know what is happening at this time. Otherwise, you might wonder what this is all about.

"Now, you may or may not—well, you will recall —that Mrs. Grist was asked about seeking employment at Borgess Hospital, and she was asked with reference to what she was told by Mr. Golla and Mr. Madgwick and I sustained the objection, and I felt at that time and I still feel that that was the proper ruling. Now I am going to permit the plaintiff to offer that testimony, and the reason I am going to permit it is this—and all counsel felt that it best I tell you why. One witness called by the defendant, The Upjohn Company, testified that he talked to Mr. Golla and Mr. Madgwick, and they confirmed what he had learned at The Upjohn Company from the Upjohn employees. While he did not recall the exact words, his answer was to the effect that his conversation with Mr. Golla and Mr. Madgwick confirmed what he had already learned at The Upjohn Company. And I felt, and I indicated to the attorneys, that since that has come in, that the plaintiff should be permitted to testify to her conversations with Madgwick and Golla, which I wouldn't let her testify to before and I feel rightly so, and now I feel she should be permitted. And that is what Mr. Hoffman intends to go into with this witness, and Mr. Staton may cross-examine her as to the matters I excluded prior hereto with reference to Borgess Hospital."

The testimony of Mr. Stearns and Mrs. Golla as to statements made to them by Mr. Golla pertaining to the same matters were also admitted for the same reason.

The rule of law governing this situation is found in 31A CJS, Evidence, § 190, pp 509-512, wherein the writer states:

"As stated in Corpus Juris, which statement has been quoted and cited by the courts, it frequently happens that evidence which might be inadmissible

under strict rules is nevertheless introduced into
the case through inadvertence or otherwise, under
which circumstances it is held, sometimes as a result
of statutory regulation, that the adverse party is
entitled to introduce evidence on the same matters
lest he be prejudiced. The party who first introduces
improper evidence cannot object to the admission
of evidence from the adverse party relating to the
same matter. However, the admission of such evi-
dence is not a matter of absolute right, but rests
in the sound discretion of the court, which will not
permit a party to introduce evidence, which should
not be admitted, merely because the adverse party
has brought out some evidence on the same subject,
where the circumstances are such that no prejudice
can result from a refusal to go into the matter
further."

Also, see 1 Wigmore on Evidence § 15, pp 304–309.

We conclude that the trial court had the discre-
tion to admit the additional testimony under the
facts and circumstances present in this case.

(2) Did the trial court err in instructing the jury
that they could find publication though the slander-
ous statements were made only to the plaintiff?

The general rule is that publication of defamatory
matter is its communication intentionally or by
negligent act to one other than the person defamed.
3 Restatement of Torts (1st ed), § 577, p 192.

This rule and its exceptions are considered in 24
ALR pp 237, 242, wherein the writer states:

"The general rule—at least, in the absence of
modifying statutory regulation, and, as hereinafter
shown, subject to some exceptions—is that the com-
munication of libelous, or the uttering of slanderous,
matter only to the person defamed, does not amount
to a publication sufficient to sustain a civil action for
damages, or, in other words, that communication to
a third person is essential to actionable publication.
\*   \*   \*

"However, many cases make an exception to, or qualification of, the general rule, where the utterer of the defamatory matter intends, or has reason to suppose, that in the ordinary course of events the matter will come to the knowledge of some third person."

The case most analogous to the facts in the instant case is *Colonial Stores, Inc.*, v. *Barrett* (1946), 73 Ga App 839 (38 SE2d 306) wherein it is stated:

"The undisputed evidence shows that defendant and Barrett were covered by the regulations of the War Manpower Commission. Those regulations provide that when an employee is discharged, he shall be given by his employer a statement of availability or a restricted statement of availability, and that 'at the time of the issuance of a restricted statement of availability, the worker should be advised that he is not eligible for new employment except upon a referral by the United States Employment Service, and he shall be directed to take the restricted statement of availability to the local office of the United States Employment Service serving the area in which the last place of employment is located.' Such regulations also provide that an applicant for employment as a new employee shall not be hired by an employer unless the applicant presents to the prospective employer a statement of availability or an official referral card of the United States Employment Service. And the undisputed evidence showed that Barrett was discharged by defendant and given a certificate of separation (which is the same as a restricted statement of availability), and that he presented his certificate to prospective employers who, after reading it, refused to employ him. * * *

"It is apparent from the evidence that defendant, when it gave said certificate to Barrett, knew that it would be presented by Barrett to one or more other persons, to-wit, Barrett's prospective employ-

ers, and that Barrett was required to so present it by a regulation of the War Manpower Commission. Therefore, under the above stated facts and the law applicable thereto, Barrett's presentment of said certificate to his prospective employers was a publication thereof for which defendant was liable in this action."

Defendant points out that this case involved a libelous statement and not a slanderous one. We do not read the rule as applying only to libelous statements. Where the conditions are such that the utterer of the defamatory matter intends or has reason to suppose that in the ordinary course of events the matter will come to the knowledge of some third person, a publication may be effected.

We find no error in regard to the second issue raised by defendant on its cross-appeal.

(3) The trial court having ruled that the occasions of publication were qualifiedly privileged, did the trial court err in refusing to instruct the jury as to slander, that plaintiff must prove (a) falsity; (b) actual malice; and that actual malice meant actuated by ill-will with a design to causelessly or wantonly injure the plaintiff?

The instruction of the trial court objected to, now and at trial pursuant to GCR 1963, 516, is as follows:

"Publications which are, therefore, privileged, qualifiedly privileged, are not actionable unless the plaintiff proves that the statements were untrue and were made in bad faith or in actual malice or without reasonable cause to believe them true. In other words, the occasions were qualifiedly privileged, for Schwenn and Juday to communicate with the Employment Office, for the Employment Office to answer inquiries from prospective employers. *Now, then, the plaintiff has the burden of proving that the statements which were qualifiedly privileged, the occasion was qualifiedly privileged, the plaintiff has the bur-*

den of proving that the statements made on those
occasions were untrue and made in bad faith or in
actual malice, or without a reasonable cause to be-
lieve them true.

"Malice may be proved by showing a background
of ill will, by proof of the style and tone of the
statement, or by the surrounding circumstances of
the publication.

"Malice is imputed to the corporation if the em-
ployee of the corporation had malice.  I mean a
corporation can act only through its employees,
agents and servants.  Therefore, if there is malice
on the part of an employee, that is imputed to the
corporation.  *  *  *

"This rule applies both to slander and wrongful
interference by the defendant."  (Emphasis sup-
plied.)

Defendant asserts that a proper instruction on the
subject appears in the case of *Mundy* v. *Hoard*
(1921), 216 Mich 478, 488, 491:

" '21. In cases of this kind malice is understood
as having a double significance; one, its ordinary
meaning of ill will against a person, and the other
its legal significance which is a wrongful act done
intentionally without just cause or excuse.  These
distinctions have been denominated malice in fact
and malice in law.  (The first implies a desire and
intention to injure, the latter is not necessarily in-
consistent with an honest purpose, but if false de-
famatory statements are made concerning another
without sufficient cause or excuse they are legally
malicious, and in all ordinary cases malice is implied
from the defamatory nature of the statements and
their falsity.)  *  *  *

" '23. (The effect therefore of showing that the
communication was made upon a privileged occa-
sion is *prima facie* to rebut the quality or element
of malice, and casts on the plaintiff the necessity
of showing malice in fact, that is, that the defendant

was actuated by ill will in what he did and said, with a design to maliciously or wantonly injure the plaintiff, and this malice in fact, resting as it must upon the libelous matter itself, and the surrounding circumstances tending to prove fact and motive, is a question to be determined by the jury.)' * * *

"2 and 3. The second and third questions may be considered together. We think the trial court did not err in applying the rule of qualified privilege, in its charge to the jury. Newell on Slander & Libel (3d ed), at § 493, after speaking of absolute privilege, says:

" 'Qualified privilege exists in a much larger number of cases. * * * The occasion on which the communication was made rebuts the inference of malice *prima facie* arising from a statement prejudicial to the character of the plaintiff, and puts upon him the burden of proving that there was malice. In short that the defendant was actuated by motives of personal spite or ill-will, independent of the occasion on which the communication was made.' "

Malice in fact is defined in the early case of *Bacon* v. *Michigan Central Railroad Co.* (1887), 66 Mich 166, 173, as follows:

"The effect, therefore, of showing that the communication was made upon privileged occasion is *prima facie* to rebut the quality or element of malice, and casts upon the plaintiff the necessity of showing malice in fact,—that is, that the defendant was actuated by ill will in what he did and said, with a design to causelessly or wantonly injure the plaintiff,—and this malice in fact, resting, as it must, upon the libelous matter itself and the surrounding circumstances tending to prove fact and motive, is a question to be determined by the jury."

In the comparatively recent case of *Bostetter* v. *Kirsch Company* (1948), 319 Mich 547, 555, 559, 560, it is stated:

"Counsel in their brief do not discuss such excerpts specifically other than to call attention to certain statements claimed to be inconsistent with other statements, and to direct attention to the following language in the charge:

" 'I charge you, members of the jury, that because the article so published by the defendant in this case was qualifiedly privileged, the burden of proof is upon the plaintiff to prove to you by a fair preponderance of the evidence, two things: First, that the charges so made were untrue and false; second, that the defendant made the publication with actual malice toward the plaintiff.'    *    *    *

"The trial court correctly charged the jury that, inasmuch as the publication was qualifiedly privileged, the burden was on plaintiff to establish the falsity of the statements made by defendant and malice on defendant's part. In *Konkle* v. *Haven* (1905), 140 Mich 472, 477, it was said:

" 'It is the established rule in this State that, in cases of privileged communications, plaintiff must prove both the falsity of the charge and malice.'

"Likewise, in the more recent case of *Van Vliet* v. *Vander Naald* (1939), 290 Mich 365, 371, it was said:

" 'Where it appears that the occasion is subject to a qualified privilege, the burden is upon the plaintiff to prove the untruth of the statements and actual malice.'

"Also, in point on the question as to the burden of proof, as well as on the facts necessary to be shown in order to establish a qualified privilege, are *Edwards* v. *Chandler* (1866), 14 Mich 471 (90 Am Dec 249); *Howard* v. *Dickie* (1899), 120 Mich 238; *Westerhouse* v. *DeWitt* (1921), 215 Mich 295; *Mundy* v. *Hoard* (1921), 216 Mich 478."

The objections by defendant to the instruction given are (1) it states in effect that statements if made without reasonable cause are actionable and

establish actual malice (not that they may be considered in determining actual malice); (2) failure of the court to define actual malice as being that which is actuated by ill-will with a design to causelessly and wantonly injure the plaintiff; and (3) the jury was not allowed to find an absence of actual malice even though the statements may have been made without reasonable cause to believe them true.

We conclude that the instruction given was erroneous even though there is dictum to the contrary set forth in the case of *Fortney* v. *Stephan* (1927), 237 Mich 603, 610.

(4) Defendant asserts in its fourth issue that the verdict of the jury was contrary to the law, contrary to the great weight of the evidence and clearly and grossly excessive and apparently influenced by passion and prejudice.

After a careful review of the record and law applicable herein, we cannot say with the exception of the finding of misconduct of a juror by the trial court requiring the granting of a new trial, and our determination on the third claimed error made in defendant's cross-appeal, that the verdict of the jury was contrary to the law or contrary to the great weight of the evidence. In view of our decision herein, we need not consider the claim that the verdict was grossly excessive and apparently influenced by passion and prejudice.

The order granting new trial is affirmed for the reasons herein stated and the cause is remanded for further proceedings not inconsistent with this opinion. Costs to appellee.

All concurred.